HORNBLOWER & WEEKS–HEMPHILL,
NOYES, INC., Appellants,

v.

Virgil CRANE, II, Appellee.

No. 1377.

Court of Civil Appeals of Texas,
Corpus Christi.

June 13, 1979.

Rehearing Denied June 28, 1979.

Scott T. Cook, Larry G. Hyden, Harris, Cook, Browning & Barker, Corpus Christi, for appellants.

C. Edwin Prichard, Jr., Prichard, Peeler, Cartwright & Hall, Corpus Christi, for appellee.

## OPINION

NYE, Chief Justice.

This is a suit brought by a nation-wide stock brokerage firm, Hornblower & Weeks-Hemphill, Noyes, Inc. (Hornblower), to recover moneys allegedly due from one of its customers, appellee, Virgil Crane, II (Crane). Crane answered, pleading limitations among other things, and filed a counterclaim for recovery of $6,285.46, the sum Hornblower had withdrawn from Crane's stock account as an "offset." After a jury trial, the trial court denied Hornblower's motion to disregard answers to certain special issues and to enter judgment for Hornblower, but instead granted Crane's motion to disregard one special issue and entered judgment on the verdict for Crane. Hornblower appeals. Crane presents a single cross-point attacking the trial court's take nothing judgment on his counterclaim.

The material facts in this case are uncontroverted. The legal effect of these material facts, however, as well as the nature of the case, are in dispute. Hornblower deals in the sale and purchase of stocks and other securities. The record indicates that Crane executed the usual "Customer's Agreement" on October 17, 1973, when he started doing business with Hornblower through a broker by the name of Sutton.

The controversy involved in this suit arose from transactions involving two corporations bearing similar names. They are The International Mining Company, Inc., a Nevada corporation, and International Mining Corporation, a Delaware corporation. In August of 1974, Crane discovered a stock certificate among his deceased father's papers which showed 2500 shares of The International Mining Company, Inc., to be standing in Crane's name. Crane telephoned Sutton to inform him of the discovery and to determine the value of the stock, if any. Crane read to Sutton the name of the company as it appeared on the stock certificate (The International Mining Company, Inc.). After their telephone conversation, Sutton checked various lists of stocks and indices of stocks and determined there was only one stock with the name

"International Mining" that was being traded; it was "International Mining Corporation." Mr. Sutton then telephoned Crane to relate that "International Mining" stock was listed on the New York Stock Exchange and was trading at approximately $16.00 per share.

On August 15, 1974, Crane instructed Sutton to sell 1000 shares of The International Mining Company, Inc. A confirmation slip was sent to Crane showing the sale of 1000 shares of "Interntl Mining Corp." On August 20, 1974, Sutton called Crane to report that the price of the stock was falling rapidly and suggested that Crane sell the remaining 1500 shares. Crane took his advice and instructed Sutton to sell the remaining shares. Thereafter, Crane received a confirmation slip similar to the first one. Four days after the second sale, Crane delivered the original stock certificate to Hornblower's Corpus Christi office. The certificate was received by the cashier, whose job it was to verify that the certificate received was of the same stock as that shown on the confirmation slips. The cashier typed out a "receive unit" which showed that Hornblower had received from Crane 2500 shares of The International Mining Company, Inc. Shortly thereafter, Hornblower deducted its commissions and charges from the proceeds of the sales and credited the balance of $34,126.80 to Crane's account.

It was not until over two years later, in September of 1976, that Hornblower discovered that Crane had delivered 2500 shares of The International Mining Company, Inc. to its office and not 2500 shares of International Mining Corporation. During the interim period, unknown to Crane, the stock certificate which Crane had delivered to Hornblower's Corpus Christi office was received by its New York office on August 26, 1974. The New York office sent the stock certificate to the "transfer agent" for International Mining Corporation on August 28, 1974. The certificate was returned to the transfer department of Hornblower's New York office on September 9, 1974, with the notation "no agent—not listed in book." On September 10, 1974, the certificate was given to Hornblower's reorganization department as a non-transferrable stock. On February 6, 1975, the reorganization department sent the certificate out for transfer again. Thereafter, on February 11, 1975, the certificate was returned with the notation "no agent at present, charter revoked March 4, 1946." The certificate was again returned to the reorganization department as a non-transferrable stock on February 13, 1975. All during this two year period of time, Hornblower did not discover that it had sold the wrong stock.

From the time the money from the proceeds of the sale of the stock had been credited to Crane's account (August 26, 1974) until mid-September of 1976, Crane actively traded in other stocks. His account at Hornblower was debited and credited as these transactions occurred. In September of 1976, Hornblower contacted Crane to report to him that it had discovered that it had not, in fact, sold the 2500 shares of The International Mining Company, Inc., but, had instead sold 2500 shares of International Mining Corporation; that the stock of International Mining Company, Inc. was essentially worthless. Hornblower, then on its own initiative, entered the market to correct its error by purchasing 2500 shares of International Mining Corporation stock for a sum of $33,890.50. When Crane refused to pay Hornblower the cost of the replacement stock ($33,890.50), Hornblower withdrew the balance in Crane's stock account ($6,285.46) as an "offset" against the $33,890.50 which it had just paid to purchase the International Mining Corporation stock. It then filed suit for the difference of $27,605.04 against Crane.

Hornblower contends in essence: 1) that pursuant to the "Customer's Agreement" between the parties, Crane appointed Hornblower to act as his "agent and broker" in the purchase and sale of securities and that all transactions under the agreement would be handled in accordance with and subject to all of the existing applicable laws, rules and regulations, customs and usages of the exchange or market and its clearinghouse; 2) that Crane agreed in the "Customer's

Agreement" that he would at all times, upon demand, immediately make payment of the entire amount of any obligation due Hornblower and expressly authorized Hornblower, as his agent, to buy in any securities of which Crane's account was short for the purpose of meeting the obligations of the various exchanges on which security transactions were handled; 3) that Hornblower received originally from Crane an order to sell 2500 shares of International Mining and that Hornblower had, in fact, sold on behalf of Crane, International Mining Corporation stock; 4) that Crane had delivered to Hornblower 2500 shares of The International Mining Company, Inc., and Hornblower did not discover the mistake until September of 1976; 5) that after such discovery, Hornblower in accordance with its obligations and the rules of the exchange, purchased 2500 shares of International Mining Corporation and then requested Crane, (pursuant to the terms of the customer's agreement), to return $33,890.50, the amount Hornblower had to pay to purchase the same number of shares in the open market; and 6) that upon Crane's refusal, Hornblower did offset $6,285.46 from Crane's account that had been maintained with Hornblower. In accordance with these allegations, Hornblower prayed for judgment against Crane in the amount of $33,890.50 plus prejudgment interest, less the sum of $6,285.46.

Crane specifically pled the defense of limitations (Tex.Rev.Civ.Stat.Ann. art. 5526 (1961)); laches, estoppel and failure of Hornblower to mitigate its damages. At the same time Crane filed a counterclaim seeking to recover the sum of $6,285.46 which Hornblower had seized from Crane's account.

In response to special issues, the jury found that: 1) Crane's receipt of confirmation slips from Hornblower did not constitute notice to Crane that Hornblower had not sold the same stock Crane owned in the International Mining Company, Inc.; 2) Crane, had he had such notice, in exercise of reasonable care and diligence, would have told Hornblower he did not own the stock that was sold; 3) Hornblower, in executing

the sale orders by selling 2500 shares of International Mining Corporation for Crane's account, acted in good faith; 4) Crane did not authorize Hornblower to sell International Mining Corporation stock for him; 5) the delivery of the stock certificate of International Mining Company, Inc., by Crane on August 21, 1974, constituted notice to Hornblower that Hornblower had not sold the stock which was delivered to them; 6) having such notice, in the exercise of reasonable care and diligence, Hornblower would have, at that time, purchased 2500 shares of International Mining Corporation and debited Crane's account.

Hornblower filed its motion to disregard the answers to special issues numbers one, two, four, five and six and to enter judgment for Hornblower, or in the alternative, to enter judgment on the verdict in favor of Hornblower. Crane filed a motion to disregard the jury's answer to special issue number three and for judgment on the verdict. The trial court denied Hornblower's motion and granted Crane's motion. The court then disregarded the answer to special issue number three as being immaterial in determining the rights of the parties and entered judgment that Hornblower take nothing. The trial court also entered judgment that Crane take nothing on its counterclaim against Hornblower for recovery of the $6,285.46.

Hornblower presents three points of error which are grouped together for argument purposes. Hornblower's basic appellate premise is that the jury's answers to special issues numbers one, two, four, five and six are all immaterial and cannot form the basis of a judgment because the undisputed evidence shows that it is entitled to judgment as a matter of law on the contract. Hornblower first contends that the trial court, in order to render the judgment that it did, must have found that Hornblower's cause of action against Crane was barred by the two year statute of limitations. Hornblower argues that this is error because its cause of action against Crane is governed by the four year statute of limitations.

Tex.Rev.Civ.Stat.Ann. art. 5527 (1961) provides, in relevant part, as follows:

"There shall be commenced and prosecuted within four years after the cause of action shall have accrued, and not afterward, all actions or suits in court of the following description:

1. Actions for debt where the indebtedness is evidenced by or founded upon any contract in writing."

Hornblower contends that Crane's indebtedness or liability falls within the purview of this statute. Crane, on the other hand, contends that Article 5527 does not govern Hornblower's cause of action because Crane's liability is outside of the written customer's agreement because Hornblower acted without Crane's authority when it sold the wrong stock not authorized by Crane.

The portion of the contract upon which Hornblower relies provides in relevant parts as follows:

"In consideration of your acting as brokers for the undersigned in the purchase and/or sale of securities, commodities, and/or other property (hereinafter collectively referred to as securities), the undersigned [Crane] hereby consents and agrees:

\* \* \* \* \* \*

4. The undersigned [Crane] will at all times maintain with you [Hornblower] securities (acceptable to you) of such value and/or monies, over and above the amount of the aggregate indebtedness of the undersigned to you as you may require and upon demand will immediately make payment of the entire amount (or such part as you may demand) of the obligations of the undersigned to you. Should the undersigned fail to make any payment to you when due or to keep the margin in any account of the undersigned with you up to your current requirements you may from time to time sell any or all such securities or buy in any securities of which any such account may be short. Any such sale or purchase may be made at your discretion on the exchange or market where such business is then transacted or at public auction or private sale without prior notice to the undersigned or

advertisement or tender or demand of any kind upon the undersigned, and any such notice, advertisement, tender or demand being hereby expressly waived by the undersigned and the undersigned shall remain liable for any deficiency. . . ."

Hornblower argues that the above quoted portion of the Customer's Agreement obligated Crane to repay Hornblower within the meaning of Article 5527 upon two distinct grounds: 1) The customer's agreement creates a broker/principal relationship; and 2) Paragraph 4 of the Customer's Agreement provides that Hornblower can buy any securities, without prior notice or demand upon Crane, and that Crane is liable for any deficiency in his account.

In determining whether or not the obligation sought to be enforced is a "contract in writing" within the meaning of the limitation statute, the Texas Supreme Court, in *International Printing Pressmen and Assistants' Union of North America v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 736 (Tex.Sup. 1946), stated:

"It has been held in this State that 'in order for an action to be one for an indebtedness evidenced by or founded upon a contract in writing, as referred to in the above quoted statute \* \* \* the written instrument relied upon must itself contain a contract to do the things for the nonperformance of which the action is brought.' (Citing authority). However, it is not indispensable that the written instrument relied upon contain an express promise to do the things for the nonperformance of which the action has brought. It is sufficient if the obligation or liability grows out of a written instrument, not remotely but immediately, or if the written instrument acknowledges a state of facts from which, by fair implication, the obligation or liability arises. And while parol evidence is not admissible to establish the promise, it is admissible to show performance on the part of the plaintiff and a breach on the part of the defendant."

■ Crane's promises, as evidenced by the contract in question, were expressly made in consideration of Hornblower acting on behalf of Crane as his broker. Hornblower admits that the parties intended for Hornblower to act as an agent for Crane in buying and selling securities pursuant to Crane's express directions. We are of the opinion that the "Customer's Agreement," upon which Hornblower relies, creates an express obligation on the part of a customer only where Hornblower is acting within the express (or implied) authority from its customer. The contract does not contain a provision authorizing Hornblower to act on behalf of Crane to correct its acts which are completed in contravention of Crane's authority or created through its own mistake, nor can we imply such a provision from the express terms of the contract. Where Hornblower acts without authority from its customer or acts on its own, and no principles of agency law, such as ratification, otherwise bind the customer, the terms of the subject "Customer's Agreement" do not create an express or implied obligation on the part of the customer nor an express or implied right on the part of Hornblower to invoke the provisions of paragraph 4 of the contract.

■ In situations as the one before us, where Hornblower sold the wrong stock by mistake and thereafter credited the proceeds of the sale to Crane's account, equitable principles, such as the recovery of money paid under mistake, unjust enrichment, etc., provide Hornblower with a cause of action to recover the money mistakenly paid to Crane's account. See e. g., 44 Tex. Jur.2d, Payment, § 77, Mistake of Fact (1963). In such a situation, however, the two year statute of limitation prescribes a period for actions on a debt where the indebtedness is not evidenced by a contract in writing. See *Hull v. Freedman*, 383 S.W.2d 236, 238–239 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n. r. e.). See also *Coastal States Gas Producing Co. v. Hamilton*, 553 S.W.2d 659 (Tex.Civ.App.—El Paso 1977, no writ); *Charles v. Charles*, 478 S.W.2d 133 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.).

■ In this case, the undisputed evidence and the jury's answer to special issue number four established that Crane did not breach the Customer's Agreement in question. The undisputed evidence and the jury's answer to special issue number four above establish that Hornblower failed to follow the directions of Crane and that it sold the wrong stock through its own mistake. This mistake was discoverable by Hornblower, by the exercise of reasonable diligence, many times prior to its actual discovery in September of 1976. The jury found that Crane's delivery of the stock certificate of The International Mining Company, Inc. on August 21, 1974, prior to the time when any money had been credited to Crane's account by Hornblower, constituted notice to Hornblower that it had not sold the same stock which Crane delivered to Hornblower's employee and agent. Hornblower's cause of action to recover the sums mistakenly paid to Crane accrued at the time Hornblower credited the proceeds of the sales to Crane's account. It was not until December 20, 1976, that Hornblower filed its first original petition which alleged a breach of the customer's agreement by Crane as a basis for its recovery. More than two years had expired from the time Hornblower's cause of action accrued until suit was filed. Crane, in defense of Hornblower's suit, affirmatively pled the statute of limitations. The trial court correctly held that Hornblower should take nothing against Crane.

Hornblower vigorously contends here that the trial court erred because Crane ratified Hornblower's unauthorized sale as a matter of law. Hornblower argues that the fact that Crane did not authorize Hornblower to sell 2500 shares of International Mining Corporation stock is immaterial and of no consequence when the following "uncontroverted facts" are considered: "(1) Hornblower sold the 2,500 shares for the benefit of and on behalf of Crane; (2) Crane received the benefit of that sale conducted on his behalf by his broker or agent, Hornblower; and (3) upon being told that

the wrong stock had been sold and upon being requested to pay the value of the stock sold, Crane refused to do so and, instead, elected to retain the benefits he had derived from the sale by his agent, Hornblower." Hornblower also contends that the confirmation slips Crane received from Hornblower, (each of which confirmed the sale of International Mining Corporation stock) as well as Crane's letter dated October 11, 1974, (which acknowledged the sale of the stock) are conclusive evidence that Crane ratified Hornblower's errors.

Hornblower's "uncontroverted" fact number one above actually is Hornblower's own conclusion. The jury's finding that Hornblower acted without Crane's authorization is supported by ample evidence. Therefore, Hornblower only purported to act on behalf of Crane when it sold the stock. The primary problem with Hornblower's argument is, however, that there are no undisputed facts or jury findings to support its claim that Crane ratified, as a matter of law, the unauthorized acts of Hornblower prior to the time the two year statute of limitations had run.

■■ We recognize the general rule, cited by Hornblower, that a principal who, with knowledge of the material facts, retains benefits of a contract made in his behalf by an unauthorized agent cannot repudiate that part of the contract which is unsatisfactory to him. Having knowledge of the facts and retaining the benefits, he is considered as having ratified the contract in its entirety, and is so bound. See *Condor Petroleum Co. v. Greene*, 164 S.W.2d 713, 721–22 (Tex.Civ.App.—Eastland 1942, writ ref'd w. o. m.), and authorities cited therein. Hornblower's own definition of ratification is his downfall. A party must have knowledge of all of the material facts in order to ratify. The virtually undisputed evidence in this case (as well as the jury findings) is to the effect that Crane did not have knowledge that Hornblower sold the wrong stock *until* September of 1976 when Hornblower informed Crane of the mistake. Hornblower's only requested issue in this regard was special issue number one in

which the jury found against Hornblower. The jury found that Crane's receipt of confirmation slips from Hornblower that Hornblower had sold 2500 shares of International Mining Corporation for his account did not constitute notice Hornblower had not sold the same stock he owned in The International Mining Company, Inc.

Crane's refusal to reimburse Hornblower for the expense it incurred in purchasing 2500 shares of International Mining Corporation stock to replace those mistakenly sold does not constitute such ratification that would defeat the statute of limitations which had already run on Hornblower's cause of action. Crane's refusal is consistent with his decision to assert the statute of limitations defense and not to ratify the unauthorized transaction or in some way to acknowledge the existence of a debt otherwise barred by limitations. Hornblower presents no argument or authority to support a theory which would take this case outside the operation of Crane's limitation defense. We, therefore, conclude that the trial court properly entered a take nothing judgment as to Hornblower's cause of action on the basis that the two year statute of limitations had run prior to the time Hornblower filed its original petition. This disposition of the case renders it unnecessary to consider Hornblower's contention that it is entitled to prejudgment interest, or interest as damages as a matter of law. Hornblower's points of error one through three are overruled.

Crane's cross-point of error is that the trial court erred in refusing to recognize Crane's counterclaim against Hornblower. In August of 1974, Hornblower credited Crane's stock account with $34,126.80 from the proceeds of the erroneous sale of International Mining Corporation stock. During the next two years, Crane completed various transactions in which he withdrew and deposited money into the account. In September of 1976, when Hornblower discovered its error, Crane had, at that time, a credit balance of $6,285.46 in this stock account. Upon discovery of its error, Hornblower demanded that Crane either produce

2500 shares of International Mining Corporation stock or deposit the sum of money which would be required to purchase such shares of stock on the open market. Crane refused. Hornblower then re-entered the market, purchased 2500 shares of International Mining Corporation stock for $33,890.50, took possession of the money remaining in Crane's account ($6,285.46) and applied it as an offset against the newly acquired stock.

■ At the time Hornblower appropriated the balance remaining in Crane's stock account as an offset, the two year statute of limitations had run on Hornblower's cause of action against Crane. In essence, Hornblower's pleadings requested the trial court to validate its action in appropriating, as a set-off, the balance remaining in Crane's stock account even though such appropriation occurred after limitations barred the claim Hornblower sought to offset. In support of its right to claim such an set-off, Hornblower relied upon paragraph 4 of the Customer's Agreement.

It is generally stated that a set-off is proper only where the demands are mutual, between the same parties and in the same capacity or right. *Masterson v. Goodlett*, 46 Tex. 402, 407 (1877); *Greathouse v. Greathouse*, 60 Tex. 597, 598 (1884); *Brook Mays Organ Co., Inc. v. Sundock*, 551 S.W.2d 160, 166 (Tex.Civ.App.—Waco 1977, writ ref'd n. r. e.); *Thompson v. Prince*, 126 S.W.2d 574, 576 (Tex.Civ.App.—Waco 1939, writ ref'd). In this case there are no separate, yet mutual, demands. The only true controversy is whether or not Hornblower is entitled to recover the money it expended to procure stock to replace the stock sold in contravention of Crane's instructions. While Crane may be morally obligated to Hornblower, Hornblower's remedy to enforce such obligation is barred by limitations. Although limitation statutes do not affect the substantive rights of the parties, they do bar the remedy when enforcement of such rights is sought. *City of Dallas v. Etheridge*, 253 S.W.2d 640 (Tex.Sup.1953); *Sam Bassett Lumber Co. v. City of Houston*, 198 S.W.2d 879 (Tex.Sup.1947). We are of the opinion that Hornblower cannot rely on the provisions of paragraph 4 to validate its action of appropriating the remaining balance in Crane's stock account when the very obligations Hornblower sought to offset were barred by the statute of limitations. The trial court did err in refusing to allow Crane's counterclaim.

■ Hornblower contends, however, that if Hornblower's valid cause of action was barred by limitations, its cause of action was good as against Crane's counterclaim pursuant to Tex.Rev.Civ.Stat.Ann. art. 5539c (Supp.1979), which provides as follows:

"In the event a pleading asserting a cause of action is filed under circumstances where at the date when answer thereto is required by law a counterclaim or cross claim would otherwise be barred by the applicable statute of limitation, then the party so answering may, within 30 days following such answer date file a counterclaim or cross claim in such cause and the period of limitation is hereby extended for such period of time provided that the counterclaim or cross claim arises out of the same transaction or occurrence that is the subject matter of the opposing party's claim."

Hornblower acknowledges that its cause of action was brought as the original action in this case. Hornblower insists, however, that Article 5539c should not preclude its retention of the "set off," because Article 5539c extends the period of limitations for Hornblower's offset. Hornblower argues that had Crane brought his counterclaim, as an original action, then Hornblower's action, (which would have been brought as a counterclaim), would have been protected by Article 5539c. Similar contentions have been considered and rejected by our Supreme Court. See *Hobbs Trailers v. J. T. Arnett Grain Co., Inc.*, 560 S.W.2d 85 (Tex. Sup.1978). Crane's cross-point is sustained.

The trial court's take nothing judgment as to Crane against Hornblower is reversed and judgment is here rendered that Crane recover $6,285.46 with interest thereon from the date of September 28, 1976, at the rate

of 6% to the date of the trial court's judgment and 9% thereafter. The remainder of the trial court's judgment is affirmed.

AFFIRMED IN PART and REVERSED AND RENDERED IN PART.