**Reversed and Rendered and Majority and Dissenting Opinions filed August 12, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00740-CV

---

## E. I. DU PONT DE NEMOURS AND COMPANY, Appellant

## V.

## ROBERT EARL ROYE AND DIANE ROYE, Appellees

---

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Cause No. 2009-80504**

---

## DISSENTING OPINION

Appellee Robert Earl Roye suffered second and third degree burns over 75% of his body at the DuPont plant when the ground beneath a pallet he stepped upon to perform his work caved in, causing him to fall into a pool of 400-degree water up to his chest. Following a jury trial, the trial court entered judgment for the Royes on, *inter alia*, their premises liability claim against DuPont. The majority reverses, concluding as a matter of law that DuPont did not owe Roye any duty

regarding the condition of the premises that caused his injuries. Because I disagree, I respectfully dissent. I would affirm the judgment.

I agree with the majority's characterization of the hazard or defect at issue. Specifically, I agree with the majority that the defect is not the steam trap on the elevated piping. The majority concludes that the pool of hot condensate was a defect, but a visible one. Again, I agree. The majority acknowledges that the hollowing of subsurface soil adjacent to the pool of hot condensate, which created a ledge, was the defect. This defect on the premises was concealed because the surface layer of clay looked stable.

I agree with the majority that there is no direct evidence that DuPont had actual knowledge that the subsurface soil had eroded to the point that it had become unstable. There is no evidence that anyone else had actual knowledge or could have perceived from merely looking that the pallet rested precariously on the surface layer of clay atop a cavern created by erosion of subsurface sand.

I disagree that there is no evidence of DuPont's actual knowledge. The record contains direct evidence that DuPont created the hazardous premises condition which, under Texas law, creates an inference that DuPont had actual knowledge of the hazardous condition on its property. *See Keetch v. Kroger Co.*, 845 S.W.2d 262, 265 (Tex. 1992). Roye did not need evidence that DuPont could have discovered this defect through a reasonable inspection because **DuPont created the defect**. Because DuPont created the premises defect, DuPont's knowledge became a question for the jury, and we must infer that DuPont had knowledge of that defect, consistent with the jury's verdict. *Id.* Therefore, I also disagree with the majority's (1) failure to analyze evidence of DuPont's actual knowledge under *Keetch* and (2) legal conclusion that duty in this case is a question of law for this appellate court.

**A.** *Keetch v. Kroger* **controls this premises liability cause.**

In 1992, the Texas Supreme Court decided *Keetch v. Kroger Co.* Appealing a take-nothing judgment, Keetch urged that because Kroger created the hazardous condition at issue it should be charged with knowledge of the defect, as a matter of law. The *Keetch* Court refused to deem an owner's actual knowledge of the owner-created defect and held, instead, that "the fact that the owner or occupier of a premises created a condition that posed an unreasonable risk of harm may support an inference of knowledge." *Id.*;[1] *accord Coffee v. F.W. Woolworth Co.*, 536 S.W.2d 539, 542 (Tex. 1976); *see also Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 645 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (stating that the inference established by *Keetch* is well-settled). But, the Court further held, "the jury still must find that the owner or occupier knew or should have known of the condition." *Keetch*, 845 S.W.2d at 265. The majority takes Justice Hecht's use of the word "may" out of context to suggest it somehow means that evidence that the owner created the defect might, in some case, be **no evidence** of duty. However, this construction places the majority opinion in direct conflict with our own precedent. We have previously held that duty becomes a question for the fact finder in an owner-created hazard because the inference arises. *SeeGrayson v. Anselmo*, No. 14-06-01073-CV, 2008 WL 660433, at *4 (Tex. App.—Houston [14th Dist.] Mar. 11, 2008, no pet.) (mem. op.) ("*Coffee* and *Keetch* stand for the proposition that a fact finder may, but need not, infer that a defendant had actual knowledge of a dangerous condition that it created. It is

---

[1] Justice Hecht's concurring opinion in *Keetch* makes clear that nothing more than an inference arises in owner-created defects because "it often happens that a person who creates a condition knows it at the time . . . [b]ut this is not always so." *Keetch*, 845 S.W.2d at 267 (Hecht, J., concurring). Therefore, creating the condition should not amount to "notice of the condition as a matter of law." *Id.* Here, upon evidence that DuPont created the condition, the trial court properly submitted the question of knowledge to the jury.

3

within the fact finder's province to decide whether the circumstances justify inferring actual knowledge against the creator of a dangerous condition.").

The *Keetch* Court then provided definition to circumstances in which the owner has created the condition for purposes of inferring knowledge. Specifically, it isn't enough that the owner simply created a condition that turned out to be hazardous. *See Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754–55 (Tex. 1970). The evidence must show that the owner created a condition "which poses an unreasonable risk of harm" in order to constitute circumstantial evidence of knowledge. *Keetch*, 845 S.W.2d at 266. An "unreasonable risk of harm" exists under Texas law if "there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Seideneck*, 451 S.W.2d at 754. Therefore, where evidence establishes that an owner has created a condition that it could reasonably foresee poses an unreasonable risk of harm, such evidence creates a fact issue for the jury on actual knowledge. *Hall,* 177 S.W.3d at 645–46 (holding that because Hall adduced evidence that Sonic left a freezer cover in an exposed, dangerous, and unstable position where it was foreseeable that it would fall to the floor, summary judgment on actual knowledge of the hazardous condition was reversible error).

The majority does not analyze DuPont's duty under *Keetch*. Instead, the majority focuses its duty analysis on the absence of evidence that DuPont had constructive knowledge of the ledge under the teachings of *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97 (Tex. 2000). *CMH* does not control this case because the defect alleged—unstable steps and platform—was a defect that developed over time "simply by virtue of its use." *Id*. at 100–01. The *CMH* Court did not analyze or address defects created by the owner or the inference of actual knowledge that arises therefrom. Instead, finding no direct evidence of actual knowledge, the

4

*CMH* Court analyzed constructive knowledge—because CMH did not create defective steps. *Id.* (stating that the issue in the case is "what are the legal consequences if premises will become unsafe over time and the owner or occupier is aware of that fact"). But, here, DuPont did not buy a non-hazardous ledge that became hazardous simply by virtue of its use.

We cannot construe *CMH* as applicable to owner-created, rather than use-created, hazards without ignoring *Keetch*. First, *CMH* and *Keetch* address completely different theories of premises liability: *Keetch* addresses premises liability for hazards created by a property owner and asks (the jury) whether the property owner knew that the condition it created was unreasonably dangerous. In so doing, *Keetch* authorizes an inference of actual knowledge. *CMH* addresses premises liability for hazards the property owner could anticipate would develop over time and asks whether the property owner knew or, through reasonable inspection, should have known had developed. *CMH* analyzes constructive knowledge. *Keetch* owner-created premises defects arise from malfeasance; *CMH* owner-should-have-discovered-the-premises-defect claims arise from nonfeasance. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 776 (Tex. 2013) (discussing the difference between premises liability claims in malfeasance and nonfeasance). *CMH* does not apply.

Second, *Keetch* does not contain a temporal limitation. However, the majority's application of *CMH* to this case grafts a temporal limitation that does not exist for owner-created hazards. For example, in *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983), the Texas Supreme Court did not ask whether the floor became dangerous at the instant an employee dropped the grape or after a person first stepped on the grape and made it gooey and slippery. *CMH*, as applied by the majority, would eliminate any duty owed by Safeway for the hazard it

5

created in the first place. Instead, in line with the post-*CMH* analysis we performed in *Grayson v. Anselmo*, we should confine our review of premises liability claims arising from owner-created hazards to *Keetch* and its progeny. *See Grayson*, 2008 WL 660433, at *3–4 (applying *Keetch*, without mention of *CMH*, to premises liability injury that occurred when the railing became separated from an owner-constructed ramp).

Finally, neither *Keetch*, *CMH*, nor any other Texas Supreme Court authority articulates a public policy to protect property owners from liability for hazardous conditions that they create but that do not cause immediate injury. A party's liability for affirmative acts of negligence or intentional conduct should not be eliminated by the fortuity of where the injury occurred. Stated differently, if a property owner lights a long fuse on the bomb he places on his property, he may be held liable for injuries when it ultimately explodes without the necessity of further inspection of the remaining length of the fuse.

The majority also urges that no *Keetch* analysis is necessary is this case because, unlike the allegation that the owner put the foreign substance on the floor in *Keetch*, there is no evidence here that DuPont dug the hole. *See* Majority Op. 21–22. The majority's analysis misses the mark. We have agreed that the premises defect in this case is the ledge that resulted from hollowing. As outlined below, there is evidence that DuPont created the ledge through its decision not to provide drainage for its high-pressure hot condensate. Further, there is evidence that DuPont should have reasonably foreseen that the undrained hot condensate posed an unreasonable risk of harm not only through the pooling of hot condensate, but also through differential erosion beneath the surface clay. DuPont did dig the hole; they just didn't use a shovel.

We should affirm.

6

**B.      There is evidence that DuPont created the condition.**

DuPont created the condition, which is hollowing or erosion beneath the ledge that collapsed, throwing Roye into 400-degree condensate. The jury heard evidence that the ledge resulted from differential ground erosion at the point of condensate discharge from the steam trap near where Roye suffered his injury. The jury learned that discharging condensate is part of the design of the steam pipe system. The very purpose of the steam trap is to improve circulation of the valuable steam by eliminating unnecessary byproduct, condensate. So, the design includes several spring-loaded steam traps to discharge the condensate from the pipe. When the steam reaches 300 psi, the steam trap opens and condensate discharges downward at a temperature of 400 degrees and a pressure of 300 psi.

The jury learned that there are three acceptable methods for hot-condensate disposal in the industry: (1) recirculate the condensate, (2) install a French drain, or (3) allow the condensate to discharge into a concrete-lined ditch. Dean Baker, an employee with DuPont at the La Porte facility at the time the piping was constructed, told the jury that the purpose of a French drain is to prevent ground degradation or erosion in the area. And, the jury saw D.B. Western's original proposed design drawing for handling discharge, Plaintiff's Exhibit 267—a French drain.

Notwithstanding D.B. Western's proposal, according to Oscar Gonzalez, "a conscious decision was made by DuPont's design team to remove four of the six French drains." According to Dennis Beatham, DuPont engineers vetoed his French Drain drawing. Thus, it was a DuPont decision to omit a French drain system to accommodate the 400-degree condensate emitting from the steam trap at 300 psi. Ultimately, DuPont did not substitute one of the other two acceptable

7

drainage systems for the French drain. Thus, DuPont decided that no drainage system would be used.

When DuPont omitted the French drain and substituted no drainage system whatsoever, it created the hollowing condition. Specifically, a French drain works like a gutter beneath a downspout, not only because it directs the flow of the hot water but also because it reduces the pressure at which the water hits the ground from approximately 300 psi to 0 psi. When hot condensate hits the ground at 300 psi, it creates a hole. Had DuPont recirculated the hot condensate—there is no drainage and, therefore no hole. Had DuPont provided a concrete-lined pit, the hole and the pooling still exists, but the pressure is applied to concrete so there is no risk of ground degradation or erosion in the area. Without any drainage, the 400-degree water hitting the ground at 300 psi created not only a pool of hot water, but also erosion of the soil beneath the steam trap.

In this case, however, no drainage of hot condensate created a problem far larger than mere erosion of the soil because in this case there were different types of soil at different layers. The jury heard testimony about the top layer of soil – clay. The jury also heard that lower levels of soil were silt or sand. Clay does not erode as easily as silt. Clay rooted with grass erodes even less. So, when hot condensate hits the soil of different types in layers, such as clay on top of silt, at 300 psi, it does not merely create a hole straight down. Instead it causes erosion at different rates. As the hot condensate hits the soil and begins to create the hole, the clay, particularly clay rooted with grass, remains in place while the silt layers beneath erode. It's called differential erosion. When the layer of clay remains and the layer of silt disappears, the condition of hollowing occurs and the ledge results. DuPont created the condition. DuPont did not use a shovel to create the hollowing of soil; it used un-drained and un-dissipated 400-degree, 300-psi condensate.

8

**C.** **There is evidence that there was a sufficient probability of a harmful event occurring that DuPont knew or should have known that the event, or some similar event, was likely to happen.**

As outlined above, the condition is the hollowing through erosion that created the ledge.

### 1. DuPont knew the event or a similar event was likely to happen.

With regard to the hazard of the condition, the jury first learned that the erosion of any soil caused by hot condensate exploding from a steam trap is a dangerous condition. Specifically, Dean Baker from DuPont told the jury that it is unsafe not to have anything for condensate disposal because if there isn't anything to catch the condensate released at 300 pounds of pressure, it's going to erode the ground. Baker's testimony is supported by DuPont's own written standard for condensate disposal. The standard directs, "Condensate shall not be discharged into open ditches, French drains, or sewers without approval of Design, Plant or Construction authority." The same standard further directs that if the design contemplates an open discharge of condensate, the preferred method is to lower the temperature of the condensate to a safe level and then discharge it or to use "a suitable catch tank (see P12B) or a properly designed French drain (see P6D)." Thus, DuPont's own standard forbids condensate disposal into an open pit, such as occurred where Roye was injured. Note that this standard requiring drainage is not a standard applicable solely to variable soil. It is the standard for all soil. Thus, there is some evidence that DuPont knew that the failure to supply a drainage system—any drainage system—not only violated its own standard but also was dangerous because of the effects of erosion.

Significantly, the jury learned that DuPont did not merely miscalculate the need for a French drain; DuPont calculated the risk and accepted it. Specifically,

DuPont's design engineers made the conscious decision to omit only four of the six French drains that were designed into the system. The sole reason that DuPont declined French drains in those four areas, though it was a departure from its own standard, was because those four areas did not have as much traffic— not as many people walking around. Stated differently, where DuPont knew many people would be walking around, it installed French drains. Where DuPont knew fewer people would be exposed to the hazard, it did not. Roye was one of the individuals for whom DuPont calculated and accepted the risks posed by no French drain.

Standing alone, the above-outlined evidence that ordinary erosion is unsafe and DuPont created a circumstance of erosion at a location it knew workers would need to maintain the steam trap is sufficient to infer knowledge and submit the question to the jury. Specifically,

(1)    DuPont created the condition, hollowing from erosion;

(2)    Erosion for failure of a condensate drainage system is an unsafe condition;

(3)    DuPont knew that it was a dangerous condition because the purpose of the industry-standard drainage is to prevent erosion; and

(4)    DuPont deliberately created the hazard only in areas not subject to high traffic because it was an extraordinary hazard.

This is circumstantial evidence of actual knowledge. *See Keetch*, 845 S.W.2d at 266 (citing *Coffee*, 536 S.W.2d 539).

### 2. DuPont should have known the event or a similar event was likely to happen.

The danger of erosion became even more dangerous because of the variable soil that turned ordinary erosion into differential erosion. And, DuPont knew about the variable soil in the area where Roye suffered injury. Specifically, the jury saw an October 2000 email from Donald Johnson, a DuPont geotechnical

10

consultant. Johnson evaluated boring and soil data in the same area where DuPont omitted the French drain. These soil borings were not conducted for purposes of deciding the appropriate hot-condensate drainage. DuPont conducted soil borings to determine the necessary depth of the drill shaft construction for the pipe rack support system. And, Johnson noted that most, but not all, of the borings showed clay "throughout the soil profile." However, he warned that in one particular boring he found "sand below 8 feet." He cautioned, "While the sand is acceptable for support, . . . it may create hole cave-in problems necessitating casing of the hole or slurry construction." Finally, he warned, "Careful inspection is essential to detect stability problems and the need for special procedures."

Although the soil data did not come to DuPont in connection with the drainage-system proposal, at least one DuPont representative should have known of the relationship between the boring data and the condensate drainage—John Ponder. In 2000, Ponder was serving as the liaison between D.B. Western, DuPont, and Harmony during the steam pipe construction. As a "first line supervisor," Ponder was "very familiar with DuPont rules, procedures, and protocols." During trial, Ponder acknowledged that he had reviewed the D.B. Western French drain design. His initials are on the design sketch. No more than one month later, a D.B. Western representative wrote to Ponder informing that D.B. Western needed Dupont's decision on the drainage for the steam trap immediately. Specifically, the letter stated, "We need to know quickly if we have to drill these pits when we have drilling done for Bell Piles." The Bell Piles are the piling referred to in the soil boring report from Johnson. D.B. Western was telling Ponder that it wanted, for efficiency reasons, to prepare the holes for rack support—which might need reinforcement due to sand—at the same time it dug a drainage system. Finally, Roye's expert witness, James Knorpp of Knorpp Safety,

11

tied this evidence together for the jury. Knorpp is a retired, 30-year safety engineer for OSHA, who formed his own safety consulting firm in 1994; so he brought 50 years of experience to the jury. Based upon the documentation Knorpp reviewed, including the above referenced documents, he opined that

- "DuPont knew that the French drains should be under each of the six steam traps on the 300-pound line" and originally intended to install them;

- Without a French drain, hot condensate spitting out of the steam trap has a tendency to erode the soil where it hits and pool;

- Soil conditions must be considered with condensate drainage because the soil must be capable of absorbing the water;

- DuPont had information about the variable soil conditions in the area and should have considered it when making a decision whether to dispose of condensate directly to the ground;

- Under these circumstances, without a French drain, the hazard (hollowing under the top soil) could be reasonably expected to occur; and

- "[T]he root cause [of Roye's accident] was that there was a failure to install the safe — proper safety equipment — that is, French drain equipment or other collection media — at the time this equipment was designed and constructed and a failure to properly evaluate the hazard that could ultimately result."

The majority notes that Johnson's soil-borings email does not address steam traps or the necessity of a French drain. Lynn Ratcliff, DuPont's expert, also concluded that the two issues were "totally unrelated" because Johnson's caution meant that when the pilings were drilled there was a danger that the sand layer at eight feet might collapse. The jury was free to disregard Ratcliff's testimony and accept Knorpp's testimony and infer that DuPont should have recognized the relationship between the two issues inasmuch as D. B. Western wanted to dig the drainage pit at the same time it dug the hole for the supporting rack. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). DuPont had all that it

12

needed to know that the dangerous condition caused by erosion was exacerbated by the variable soil.

## D.    Conclusion

In summary, I respectfully dissent to the decision to reverse the jury's verdict. *Keetch v. Kroger* is still Texas law. Owner-created conditions that pose an unreasonable risk of harm give rise to a jury question on knowledge—actual knowledge. *CMH Homes, Inc. v. Daenen* does not constitute a develops-over-time exception to *Keetch*.

The jury heard evidence that (1) DuPont created the condition and (2) there was a sufficient probability of a harmful event occurring that DuPont knew or should have known that the event, or some similar event, was likely to happen. DuPont deliberately departed from industry standards and created an unreasonable risk of harm to a few on its premises while shielding others from it. Roye was one of the few. The jury determined DuPont had knowledge and we should honor that decision.


/s/    Sharon McCally
Justice

Panel consists of Justices McCally and Busby and Former Justice Simmons.[*] (Busby, J., Majority).

---

[*] Former Justice Rebecca Simmons, sitting by assignment.